***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn, and the briefs and arguments of the parties. The appealing party has shown good grounds to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of Deputy Commissioner Glenn and enters the following Opinion and Award.
 *********** RULING ON EVIDENTIARY MATTER
On June 24, 2011, Defendants Hospira, Inc. and XL Specialty Ins. Co. filed with the Industrial Commission a Motion to Allow Additional Evidence into the record pursuant to N.C. Gen. Stat. § 97-85 and Rule 701 of the Workers' Compensation Rules of the North Carolina Industrial Commission. Defendants seek to have the Industrial Commission Form 18, Motion to Show Cause, and November 3, 2010 Order of Deputy Commissioner George R. Hall, III relating to I.C. No. W66395 made a part of the record. Plaintiff has objected to the Motion.
Pursuant to Rule 701(6), the Full Commission DENIES Defendants Hospira, Inc. and XL Specialty Ins. Co.'s Motion to Allow Additional Evidence.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. Plaintiff was employed by Defendant-Employer Abbott Laboratories, Inc. from 1983 to 2004 then Hospira, Inc. from 2004 through 2007. *Page 3 
2. Fireman's Fund Insurance Company had coverage for defendant from January 1, 1993 to January 1, 1996. Kemper/Broadspire had coverage for the defendant from January 1, 1996 through January 1, 2004. Fidelity Guaranty (USFG) had coverage for the defendant from January 1, 2004 to January 1, 2005. XL Specialty Insurance Company had coverage for defendant January 1, 2005 through January 1, 2008.
3. In the event Abbott is found to be liable as an employer during any time period related to Mr. Johnson's employment, then Hospira will be responsible for any such liability, subject to any applicable insurance policies. In no way should this stipulation be considered or interpreted as a waiver of any rights Plaintiff may have to collect directly from either Abbott or Hospira should Plaintiff prevail at hearing.
4. The parties are subject to the North Carolina Workers' Compensation Act, the Defendant-Employer employing the requisite number of Employees to be bound under the provisions of said Act.
5. The parties stipulated to the following documents:
 a. Form 18 filed March 20, 2008;
 b. Form 61 filed on April 25, 2008 by Hospira, Inc. and Gallagher Bassett Services;
 c. Form 61 filed on July 7, 2008 by Hospira, Inc. and US Fidelity and Guaranty Company;
 d. Form 33 filed May 20, 2009;
 e. Amended Form 18 filed June 1, 2009;
 f. Form 33R filed July 7, 2009 by Hospira, Inc. and XL Specialty Insurance Company; *Page 4 
 g. Form 33R filed June 4, 2009 by Hospira, Inc. and Fireman's Fund Insurance Company;
 h. Form 33R filed October 30, 2009 by Hospira, Inc. and US Fidelity and Guaranty Company;
 i. Plaintiff's Responses to Defendant Hospira, Inc., and XL Specialty Insurance Company's First Set of Interrogatories and Request for Production of Documents;
 j. Defendant Hospira, Inc. and XL Specialty Insurance Company's Responses to Plaintiff's First Set of Interrogatories and Request for Production of Documents;
 k. Defendants Hospira, Inc. and XL Specialty Insurance Company's First Supplemental Responses to Plaintiff's First Set of Interrogatories and Request for Production of Documents as well as Defendant's Responses to Plaintiff's Second Request for Production of Documents;
 l. Defendants Hospira, Inc. and XL Specialty Insurance Company's Second Supplemental Responses to Plaintiff's First Set of Interrogatories and Request for Production of Documents as well as Defendants' Supplemental Response to Plaintiff's Second Request for Production of Documents;
 m. Defendant Hospira, Inc. and XL Specialty Insurance Company's Third Supplemental Responses to Plaintiff's First Set of Interrogatories and Request for Production of Documents; *Page 5 
 n. Defendant Hospira, Inc. and XL Specialty Insurance Company's Supplemental Responses to Plaintiff's Third Set of Interrogatories and Request for Production of Documents;
 o. Defendant Hospira, Inc. and XL Specialty Insurance Company's Supplemental Responses to Plaintiff's First Set of Interrogatories and Request for Production of Documents as well as Supplement to Responses to Plaintiff's Third Set of Interrogatories and Request for Production of Documents;
 p. Defendants Abbot Laboratories, Inc.'s and Fireman's Fund Insurance Company's Unverified Responses to Plaintiff's Second Set of Interrogatories and Request for Production of Documents;
 q. Plaintiff's Social Security Earnings History;
 r. Site Map of Hospira, Inc.;
 s. Medical Records from Dr. Jeffrey Crawford;
 t. Medical Records of Plaintiff.
6. The following exhibits were admitted into evidence at the hearing before the Deputy Commissioner:
 a. Plaintiff's #1, blowup of facility layout;
 b. Plaintiff's #2, Plaintiff's email to his manager dated March 5, 2007;
 c. Plaintiff's #3, radiation survey report of factory dated July 6, 2006;
 d. Plaintiff's #4, radiation survey report by Abbott/Hospira
 e. Plaintiff's #5, corporate survey annual 2007 safety report; *Page 6 
 f. Defendants' #1, Plaintiff's verified responses to Defendant's First Set of Interrogatories and Request for Production of Documents;
 g. Plaintiff's #6, Verification signed by Adam B. Angel;
 h. Defendants' #2, irradiator during the construction of the facility;
 i. Defendants' # 3, layout of the gamma facility at Rocky Mount;
 j. Defendants' #4, state regulations;
 k. Defendants' #5, email from Mr. Johnson to Ron Winstead;
 l. Defendants'#6, meeting minutes; and,
 m. Plaintiff's #7, Global Dosimetry Solutions Environmental Report.
 *********** ISSUES
1. Issues of Plaintiff:
 a. Whether Plaintiff suffers from a compensable disease and/or complication, aggravation or acceleration of an occupational disease, and if so, what disease(s);
 b. What benefits, monetary and/or medical, is Plaintiff entitled to receive, if any;
 c. Whether the Plaintiff shall be entitled to attorney fees for the unreasonable defense of this matter;
 d. Whether Plaintiff's lung disease and/or employment caused, aggravated, accelerated, or exacerbated any other disease, including but not limited to lung cancer, or whether it was aggravated, accelerated or exacerbated by any other disease, and, if so, what disease; *Page 7 
 e. What benefits is Plaintiff entitled to as a result of his partial or total disability; and
 f. Whether Plaintiff is entitled to the more favorable remedy, if applicable, including that which is provided by N.C. Gen. Stat. § 97-31.
2. Issues of Defendants:
 a. Whether Plaintiff sustained a compensable occupational disease arising out of and during the course and scope of his employment with employers;
 b. If so, when was his last injurious exposure; and
 c. If so, then what benefits is he entitled to receive?
 ***********
Based upon the evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 62 years old, having a date of birth of May 22, 1949.
2. Plaintiff began working for Abbott Laboratories, Inc. in North Chicago, Illinois around 1982, first as a Project Engineer and then as a Unit Manager.
3. Plaintiff transferred to Abbott's facility in Rocky Mount, North Carolina, in order to be closer to his parents who lived in West Virginia. Plaintiff initially worked as a project engineer and then became the Gamma Sterilization Facility ("Gamma Facility") Manager around 1992. In that capacity, Plaintiff oversaw the construction and initial operation of the Gamma Facility, which became operational in October 1993. Plaintiff held the Gamma Facility Manager position until his retirement in 2007. The Gamma Facility was purchased by Hospira, Inc. on May 1, 2004. *Page 8 
4. The Gamma Facility contains a JS8900 Panoramic Irradiator designed and installed by MDS Nordion (Nordion), which has constructed 15 to 20 such irradiators worldwide. The irradiator is designed to limit exposure to 100 millirem ("m/rem") per year, which is consistent with the federal standards for radiation exposure to non-radiation workers. Construction of the irradiator was in conformance with the U.S. Code of Federal Regulations.
5. The source material in the irradiator, Cobalt-60, is stored in a cell made of 6' thick reinforced concrete walls. Manufactured medical products shipped to the facility are transferred to aluminum carriers that travel in and out of the irradiator's source cell via trolley system. While in the source cell, the carriers are exposed to gamma rays that emanate from Cobalt-60 stored on a source rack that is raised out of the source pool during the irradiation process.
6. The Gamma Facility is licensed by the State of North Carolina, which inspects the facility every 12 to 18 months. The Gamma Facility has never been warned, cited or fined for radiation safety issues.
7. In July or August of 2004, Plaintiff presented to his primary care physician, Dr. Jay Hood, with complaints including abdominal pain. A CT scan ordered by Dr. Hood revealed a number of nodules in Plaintiff's lungs, and a biopsy of the same was taken.
8. In September 2004, upon referral by Dr. Hood, Plaintiff reported to Duke University Medical Center where he came under the care of Dr. Jeffrey Crawford and Physician's Assistant Susan Blackwell. Dr. Crawford is Plaintiff's treating physician.
9. Plaintiff underwent a fine needle biopsy of one lung nodule, which led to the diagnosis of stage IV adenosquamous lung cancer. Dr. Crawford did not offer an opinion as to the cause of Plaintiff's lung cancer. *Page 9 
10. Plaintiff contends that, while working at Defendant-Employer's Gamma Facility in Rocky Mount, North Carolina, he was exposed to a low level radiation beam which caused his lung cancer.
11. Debra Hillman and Frank Rescek are master's level health physicists who have performed annual safety audits of the Gamma Facility for the past 16 years, each having performed that duty for 8 years. The annual safety audit involves review of the facility's compliance with regulatory and licensing requirements; review of operating, warning and emergency procedures; a site visit where the irradiation safety officer at the facility is interviewed; performance of a weekly or monthly interlock and warning system check; review of instrument calibration and worker training; review of personnel dosimetry, environmental monitoring and radiation survey reports; and creation of an audit report.
12. State law requires that a radiation survey be performed each time Cobalt-60 is added to the machine because radiation on the outside of the cell is proportional to the amount of radiation inside the cell, both of which can increase when source material is added. Radiation surveys were performed by both Nordion and Abbott and reflect specific monitoring of 55 locations inside and outside the facility. Radiation surveys were also performed during two shut downs each year and each month by facility staff.
13. Personal dosimeters are also used to monitor radiation in the facility. They absorb radiation and are sent to an independent, third-party to be tested. Plaintiff was required to wear a personal dosimeter any time he entered the source cell. When his personal dosimeter was not being worn, it was stored in a non-shielded box in the control room of the facility, which is near the inlet barrier door of the irradiator where slightly elevated radiation readings were typically *Page 10 
found. Each personal dosimeter constantly records radiation in the facility whether or not it is being worn by an employee.
14. There were 15 environmental monitors located at the Gamma Facility between 1993 and 2006 that measured absorbed radiation both inside and outside the facility at all times. Because the source material, Cobalt-60, was not loaded into the irradiator as of August 1993, the initial environmental dosimetry report reflects background levels of radiation naturally occurring in the environment from sources such as sunlight, radon, and soils containing uranium and thorium. Background radiation caused by soil and cosmic radiation in the Piedmont of North Carolina total approximately 200 m/rem per year.
15. There were no large increases in the amounts of radiation recorded by the environmental monitors between 1993, prior to the loading of Cobalt-60 at the Gamma Facility, and 2008.
16. A relatively small, higher than background field reading was found at two points in the Gamma Facility conference room during a routine radiation survey performed by both Nordion and the Gamma Facility in July 2006, following a re-load of Cobalt-60. A reading of 0.10 m/rem per hour of radiation exposure was obtained at a point in the conference room located 65 feet from Room 932, the location of Plaintiff's office for part of his tenure at the Gamma Facility. A reading of 0.05 m/rem per hour of radiation exposure was obtained at a point in the conference room located 35 feet from the other office Plaintiff occupied during his employment at the Gamma Facility, Room 906. As of July 2006, the conference room had been previously monitored by both the Gamma Facility and Nordion on at least 48 occasions by more than 20 people. *Page 11 
17. Plaintiff's Exhibit 1 is a blueprint of the Gamma Facility to which Plaintiff added two lines drawn in a cone shape from one corner of the source rack containing Cobalt-60 to Plaintiff's offices. This is intended to demonstrate Plaintiff's claim that radiation from the Cobalt-60 traveled in a beam through the conference room wall to his office. From 1993 to 1997, Plaintiff's office was located in Room 906 as reflected on Plaintiff's Exhibit 1. From 1997 to 2006 Plaintiff's office was located in Room 932.
18. Plaintiff acknowledged that he is not as qualified as Debra Hillman, Frank Rescek, and employees of Nordion, including Kevin O'Hara, regarding radiation safety. He further acknowledged that he is not an expert on the health effects of exposure to radiation.
19. There is no scientific basis for Plaintiff's beam theory. Dr. Auxier testified, "In reality, this cone, of course, doesn't exist. There is no beam." Radiation interacts with matter through a process called Compton reactions or scattering. Each interaction with a new object or mass causes radiation to change direction and reduce in intensity, which lowers the level of energy. The radiation at a location in the conference room designated "point 26" consisted of some primary radiation, but the vast majority was scattered radiation that was lower in energy.
20. Environmental monitors 1 and 2 were the closest to Plaintiff's offices. Radiation from the source pool would have to travel through a 6' thick reinforced concrete wall, two internal sheetrock walls, and two exterior walls made of prefabricated steel where environmental monitors 1 and 2 were located before it would reach Plaintiff's offices. Environmental monitors 1 and 2 would have reflected radiation emanating from the field in the conference room if it had traveled further to Plaintiff's offices. There were no significant changes in radiation levels as recorded by environmental monitors 1 and 2 from 1993 to 2008. *Page 12 
21. John Auxier, Ph.D. is a world renowned expert in health physics, radiation protection, and human radiobiology, having served as the President of the Health Physics Society. Dr. Auxier was involved with the Atomic Energy Commission's efforts to measure radiation doses and study the effects of different bomb designs on radiation fields following the atomic bomb in Hiroshima. Dr. Auxier stated about the Gamma Facility, "Well, of all the irradiation facilities I've ever seen, this one has the lowest potential for exposing the workers and the population of any I've seen."
22. Dr. Auxier calculated dose versus distance from the higher than background reading in the conference room to Plaintiff's office in the Gamma Facility to create a dose reconstruction in order to calculate the actual and maximum exposure to radiation Plaintiff sustained while employed by Defendant-Employer. Dr. Auxier initially relied on Plaintiff's personal dosimeter reports to conclude that Plaintiff's actual lifetime exposure to radiation at the Gamma Facility was 133 m/rem, which is less than one year of natural background radiation in the Piedmont of North Carolina. As Plaintiff worked at the Gamma Facility for 13 years, his actual annual exposure averaged 10 m/rem per year.
23. Dr. Auxier did not observe any extra shielding in the cabinet in the control room in which personal dosimetry badges were stored, and he confirmed that badges stored in the cabinet would record the same amount of radiation as the badges belonging to employees sitting in the control room.
24. Radiation found in the conference room continued to scatter in all directions and reduced in intensity the further the gamma photons moved away from the source. The amount of radiation in Plaintiff's offices, which were located 65 and 32 feet from the conference room wall, were 0.002 m/rem per hour and 0.009 m/rem per hour, respectively. Neither a level of 0.002 *Page 13 
m/rem nor a level of 0.009 m/rem would be detectable using a Geiger counter or other instrument used to measure radiation. When asked whether Plaintiff would have received any measurable dose of radiation when sitting in his office located 65 feet from the conference wall, Dr. Auxier opined, "No, sir. He wouldn't get dose from that."
25. Dr. Auxier also estimated the maximum exposure to Plaintiff in the Gamma Facility, based on an assumption that Plaintiff's chair was positioned in front of the higher than background field in the conference room, and that Plaintiff stood in the chair 8 hours per day, 5 days per week. Dr. Auxier determined that Plaintiff would have been exposed to 0.1 m/rem of radiation per hour or 200 m/rem per year in such a scenario. Dr. Auxier also considered that the amount of radiation located in the conference room was proportional to the amount of source material added to the machine in 2006, which would increase Plaintiff's exposure to 210 m/rem per year.
26. Dr. Auxier concluded that he could find no source of radiation at the Gamma Facility sufficient to have caused Plaintiff's cancer because the doses were much lower than any dose ever documented to have produced a biological effect in humans.
27. Scientists dedicated to the study of radiation exposure and its related health effects determined that cancer was not found in individuals exposed to less than 5,000 m/rem of radiation per year. The Nuclear Regulatory Commission now allows radiation workers to be exposed to 5,000 m/rem of radiation each year. Plaintiff's maximum exposure as calculated by Dr. Auxier was 4.2 percent of 5,000 m/rem per year.
28. Dr. David Hoel is an epidemiologist with a Ph.D. in mathematical statistics and a post-doctorate degree in preventive medicine. Dr. Hoel worked with the National Institutes of Health (NIH) (formerly known as the National Institute of Environmental Health Sciences *Page 14 
(NIEHS)) for approximately 20 years to develop basic methods of estimating the risk to human health posed by substances such as radiation and chemicals. Dr. Hoel was the associate director of the Radiation Effects Research Foundation in Japan as part of his affiliation with the National Cancer Institute where he spent two years studying epidemiology, statistics and computing risk assessment while developing a cancer registry in Hiroshima and Nagasaki. Dr. Hoel has been a member of and/or participant in numerous national and international organizations whose focus is to study radiation and its effects. Dr. Hoel was a member of the BEIR V Committee that studied low linear energy transfer of x-ray and gamma particles for which he specifically developed radiation risks for different types of cancers that were eventually adopted by regulatory agencies such as the EPA. BEIR V and BEIR VII assume linear no-threshold theory in order to be conservative with risk estimates.
29. The National Council on Radiation Protection and Measurements noted it is impossible to defend on medical grounds any statement that a specific cancer was caused by a particular radiation exposure. Because there is no unique signature on a tumor that indicates if the tumor was caused by radiation, there are accepted and well-published processes for analyzing whether a specific malignancy was caused by a specific exposure to radiation. Risk assessment tools recommended by the International Atomic Energy Agency and the National Academy of Sciences are well-accepted scientific methods to ascertain whether or not a particular exposure to radiation caused lung cancer.
30. Dr. Hoel was a member of the committee that created the Interactive Radiation Effect Program (IREP), which was developed by NIH in conjunction with the National Academy of Sciences and is designed to calculate the likelihood a disease was caused by exposure to ionizing radiation. The data inputs for the IREP include the type of cancer, the individual's date *Page 15 
of birth, his/her gender and smoking history, the individual's exposure to radiation and whether the exposure was acute or chronic, the type of exposure, the energy level for the exposure and the date of diagnosis, which impacts the latency period. The IREP has been adopted by the National Cancer Institute, NIOSH, the Veteran's Administration, and the Departments of Energy and Labor.
31. The Veteran's Administration and the Department of Energy use the IREP to determine the likelihood that a former federal employee's disease was caused by exposure to radiation at a nuclear facility. In order to be eligible for federal benefits as a result of exposure to radiation, causation must be more likely than not or greater than 50 percent per the IREP calculation.
32. Dr. Hoel relied on Dr. Auxier's dose reconstruction and the IREP to calculate the likelihood that Plaintiff's cancer was caused by exposure to radiation at the Gamma Facility. Relying on Dr. Auxier's estimate of Plaintiff's highest exposure (400 m/rem per year), the IREP determined there is less than a one percent chance that Plaintiff's cancer was caused by exposure to radiation at work. Dr. Hoel also performed an IREP calculation using Dr. Auxier's maximum exposure estimate of 210 m/rem per year and a ten-year latency period. Based on this calculation, Dr. Hoel determined that there was a 0.08 percent chance that Plaintiff's lung cancer was caused by radiation exposure at the Gamma Facility. Dr. Hoel opined to a reasonable degree of scientific probability that Plaintiff's exposure to gamma radiation at the Gamma Facility did not cause Plaintiff's lung cancer.
33. Dr. Fred Mettler is a medical doctor with a master's degree in environmental health from the Harvard School of Public Health who is nationally and internationally recognized as an expert on the human effects of exposure to ionizing radiation. He has written *Page 16 
numerous peer reviewed publications on the health effects of exposure to radiation including a textbook in its third edition entitled "Medical Effects of Ionizing Radiation." He has also served on numerous boards and committees whose purpose it is to study the effects of radiation and is the United States' representative to the United Nations Scientific Committee on Effects of Atomic Radiation (UNSCEAR). Dr. Mettler has been designated in the past as an expert in radiation safety and protection, epidemiology, dosimetry and the medical effects of ionizing radiation due to radiation accidents or injuries.
34. Individuals are exposed to natural background radiation such as cosmic or gamma rays from the ground or building materials, radioactive materials found in foods, and radon. Public levels of exposure to radon, which comes out of the ground and disperses in the atmosphere, can cause lung cancer. The average level of exposure in terms of effective dose per year from radon is 210 m/rem. Effective dose takes into account "tissue weighing factor" which is a measure of the differences in sensitivity of different tissues in the body to the induction of cancer by radiation.
35. Dr. Mettler reviewed Plaintiff's medical records and the reports of Drs. John Auxier and Arthur Frank before running several calculations and giving his expert opinion on whether Plaintiff's exposure at work caused his lung cancer. In forming his opinion, Dr. Mettler considered Plaintiff's age, the type of cancer at issue and whether or not the diagnosis was accurate, the latency period between the date of exposure and the date of diagnosis, the dose of radiation Plaintiff was exposed to as determined by Dr. Auxier's dose reconstruction and how the exposure occurred (acute versus chronic), the type of radiation involved, and whether there were other potential causes of the disease such as a history of smoking history and exposure to radon and asbestos. Dr. Mettler's calculation relied on the linear non-threshold model and *Page 17 
estimated a five-year latency period, which is shorter than the generally accepted minimum ten-year latency period and far shorter than the 20 to 25 year average latency period for the development of solid tumors, and assumed that Plaintiff was exposed to 400 m/rem of radiation per year. This is almost double the worst case scenario estimate of Plaintiff's exposure provided by Dr. Auxier.
36. Based on his calculation, Dr. Mettler concluded that there was a 0.58 percent chance that Plaintiff's exposure to radiation at work caused his lung cancer. He testified, "there is more than a 99.4 percent probability that this cancer is due to something else." Dr. Mettler opined to a reasonable degree of medical certainty that Plaintiff's lung cancer was not caused by the calculated exposure to radiation while Plaintiff was employed by Defendant-Employer. With respect to the question of whether Plaintiff was at an increased risk of developing lung cancer than the general public by virtue of his employment with Defendant-Employer, Dr. Mettler opined to a reasonable degree of medical certainty that, on a scientific basis, there was no evidence of an increased risk at the calculated dose levels. Dr. Mettler further opined that, on a hypothetical level for radiation protection purposes, there was a risk of less than one percent that Plaintiff's radiation exposure caused his lung cancer.
37. Dr. Mettler opined, "There is no compilation of epidemiological studies that shows statistical increases in cancer at doses below 5,000 millirem."
38. Epidemiological studies in humans do not show that exposure to radiation accelerates existing lung cancer.
39. In support of his contentions, Plaintiff offered the testimony of Dr. Arthur L. Frank, a medical doctor board certified in occupational and internal medicine who, at the time of his deposition, was a Professor of Public Health, Chair of the Department of Environmental and *Page 18 
Occupational Health and a Professor of Medicine at the Drexel University College of Medicine. Dr. Frank opined that Plaintiff's exposure to radiation while working at the Gamma Facility was a substantial contributing cause to his development of lung cancer. Dr. Frank's opinion was based in part on his theory that radiation in the Gamma Facility traveled in a straight line from an area of leakage in the conference room to Plaintiff's office, a theory that Dr. Auxier, among others, testified there was no scientific basis for.
40. Another basis for Dr. Frank's opinion was his belief that constant exposures to low levels of radiation is no different than an acute exposure to a high dose, an opinion that Dr. Hoel stated was contradicted by the National Academy of Sciences, IREP and BEIR V.
41. Dr. Frank testified regarding his opinion on the impact of dose on whether exposure to gamma radiation causes lung cancer, "anything that causes cancer has only one safe dose and that is zero. Any dose above zero carries with it some risk." When asked whether it was true that even background radiation exposure was not completely safe, Dr. Frank initially stated that he was in agreement with that statement, but went on to state, "It's only when I have evidence of exposure above background that it becomes more likely than not" that a person's exposure was the cause of their cancer. Dr. Frank acknowledged that he had no knowledge of background radiation level in Rocky Mount, North Carolina, the location of the Gamma Facility.
42. The Full Commission gives greater weight to the opinions of Dr. Auxier, Dr. Hoel and Dr. Mettler than to the opinions of Dr. Frank.
43. Based on the preponderance of the evidence in view of the entire record, the Full Commission finds that Plaintiff's occupational radiation exposure did not substantially contribute to the development of his lung cancer or accelerate an already existing disease, nor did it place *Page 19 
Plaintiff at an increased risk as compared to members of the general public of developing lung cancer.
44. Plaintiff was working full-time and was not disabled as of 2005 and 2006. Plaintiff was able to continue to work as of February 2007, but elected to retire rather than accept a demotion.
45. As of May 2007, Plaintiff was self-employed as a day trader. He earned $113,960.75 from Hospira in October 2004 as compared to $206,000 as a day trader in 2009.
46. Defendants timely denied Plaintiff's claims for benefits.
47. Defendants had reasonable grounds for defending this claim.
 ***********
The foregoing stipulations and findings of fact engender the following:
 CONCLUSIONS OF LAW
1. The greater weight of the competent medical evidence fails to prove that Plaintiff suffered a compensable occupational disease, namely lung cancer, which was caused by exposure to radiation emanating from Cobalt-60 located in the Gamma Facility owned Defendant-Employer. Click v. Pilot Freight Carriers, Inc.,300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980); Cannon v. GoodyearTire Rubber Co., 171 N.C.App. 254, 262, 614 S.E.2d 440.
2. Furthermore, Plaintiff has not been totally or partially disabled as a result of his lung condition because he continues to earn wages greater than or equal to his pre-injury wages. Therefore, his claim for an occupational disease pursuant to N.C. Gen. Stat. § 97-53(15) must be barred. N.C. Gen. Stat. §§ 97-2(9); 97-53(15); Russell v. Lowes Prod.Distrib., 108 N.C. App. 762, 425 S.E.2d 454 (1993). *Page 20 
3. Defendants' defense of Plaintiff's claims was based on reasonable grounds. Therefore, Plaintiff is not entitled attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits associated with his alleged occupational disease is DENIED.
2. Plaintiff's claim for attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1 is DENIED.
3. Each side shall bear its own costs.
This the 16th day of September, 2011.
 S/___________________ LINDA CHEATHAM COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG CHAIR
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER